IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICANS FOR PROSPERITY FOUNDATION, *Plaintiff*, v. U.S. DEPARTMENT OF VETERANS AFFAIRS, *Defendant*. | Civil Action No. 21-1954 (RC) |

**PLAINTIFF'S MOTION FOR MODIFICATION
OF THE COURT'S PRODUCTION ORDER**

Plaintiff Americans for Prosperity Foundation ("AFPF") respectfully moves the Court to modify its July 11, 2022 Minute Order requiring Defendant U.S. Department of Veterans Affairs ("VA") to process 500 pages per month in this Freedom of Information Act ("FOIA") case. AFPF proposes instead that the Court require the VA to process at least 750 pages of non-duplicative, responsive agency records every month—or more, if the Court deems it appropriate. As reflected in the parties' last Joint Status Report, AFPF has informed the VA of its intent to file a motion to modify the production order, as required by Local Rule 7(m). *See* Joint Status Report ¶ 4, ECF No. 27. The agency opposes the relief sought.

**INTRODUCTION**

This case has been pending for roughly seventeen months, and the parties have been attempting to negotiate the production of email records since November 2021. After a series of initial conversations concerning the identification of records custodians, search terms, and the scope of AFPF's consolidated FOIA requests, the VA finally started releasing records. It may have taken a court order to finally set a date for the agency's first production, but the path forward

seemed clear. Unfortunately, the agency's disclosure efforts have been lackluster. The overwhelming majority of records produced to AFPF is comprised of duplicate copies of a handful of non-email attachments, and the agency has avoided explaining why this is the case. Last month, the agency also informed AFPF that it had "inadvertently" omitted an entire year's worth of relevant records and therefore wanted AFPF to further narrow its requests. Throughout all this, the VA has declined invitations to negotiate the processing of AFPF's requests, and that evasiveness has frustrated the filing of the parties' joint status reports on several occasions. To make matters worse, the specter of politicized FOIA review continues to overshadow this case. Although the relief sought by AFPF is modest, especially compared to production rates ordered by courts in some other cases, the Court's intervention at this impasse is needed.

## FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit concerns fifteen FOIA requests—now consolidated—which AFPF submitted to various offices and components of the VA. Decl. of Ryan P. Mulvey ¶ 3. The requests seek records reflecting the VA's implementation of the MISSION Act of 2018 and the Veterans Community Care Program ("VCCP"). Mulvey Decl. ¶ 4. Through its requests, AFPF aims to better understand how changes in the VCCP's access standards are reflected in current appointment and wait-time data at various VA medical centers, especially given the COVID-19 pandemic. Mulvey Decl. ¶ 4. AFPF also aims to bring to light guidance or directives that may have been issued by top VA officials or the White House concerning proper interpretation of the VA's VCCP regulations. Mulvey Decl. ¶ 4.

After an initial disclosure of non-email records last year, the parties turned to negotiating the final set of email searches. *See, e.g.*, Mulvey Decl. ¶¶ 7–18. The parties agreed on a list of custodians and search terms, and in June 2022 the VA indicated its willingness to execute AFPF's

narrowed search commands and begin processing records. Mulvey Decl. ¶ 19. Given the parties' inability to reach agreement on a voluntary deadline for the VA's first production, *see* Mulvey Decl. ¶ 24; Joint Status Report, ECF No. 24, the Court entered a production order. Specifically, the Court ordered the VA "to process 500 pages per month and produce responsive documents within 30 days of the date of the] order, and on that same date each month until production is complete." Minute Order (July 11, 2022). On its own terms, the order required the VA to produce its first production on or before August 10, 2022, and to release further productions in subsequent months on a date determinate—namely, the tenth of each calendar month. Mulvey Decl. ¶ 25.

The VA has made five interim productions. In August 2022, it processed 5,021 "items" but only released a single six-page record. Mulvey Decl. ¶ 29.[1] In September 2022, the agency released 192 pages of records, excluded 4,352 non-responsive "items," and determined 432 pages to be outside agency control. Mulvey Decl. ¶¶ 33 & 35. In October 2022, the VA released 508 pages and excluded 127 non-responsive "items." Mulvey Decl. ¶ 40.[2] In November 2022, it released 538 pages of records. Mulvey Decl. ¶ 45. And, most recently, in December 2022, the VA released 523 pages of records and excluded 26 pages as non-responsive. Mulvey Decl. ¶ 50.[3]

In total, the VA has produced 1,767 pages of responsive records. But that number is misleading. The bulk of what the VA has released has been duplicative email attachments. The agency has only released eighteen discrete records, of which five are email messages. Mulvey Decl. ¶ 54. The remainder of the pages produced are copies. Mulvey Decl. ¶¶ 27–52. The VA has not explained why it is producing such a high volume of duplicative material, nor has it explained the predominance of "parentless" attachments in its productions. Mulvey Decl. ¶ 56.

---

[1] The VA also excluded three pages of logos. Mulvey Decl. ¶ 29.

[2] The VA also excluded nine images, including a logo. Mulvey Decl. ¶ 40.

[3] The VA also excluded two blank pages. Mulvey Decl. ¶ 50.

3

**LEGAL STANDARD**

The FOIA requires an agency to "make . . . records promptly available" upon receipt of a valid request. 5 U.S.C. § 552(a)(3)(A). The statute imposes no restriction on a district court's exercise of its inherent equitable power to address delays in production. *See Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988). Courts regularly require agencies to follow court-imposed timelines to produce records, and a court is free to modify such timelines. *See, e.g.*, *Seavey v. Dep't of Justice*, 266 F. Supp. 3d 241, 246–48 (D.D.C. 2017) (ordering agency to process "2,850 pages per month"); *Clemente v. Fed. Bureau of Investigation*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014) (ordering agency to "process 5,000 pages a month"); *Elec. Frontier Found. v. Dep't of Justice*, 517 F. Supp. 2d 111, 120–21 (D.D.C. 2007) (ordering agency to process 800 pages every 4 weeks); *see also Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 38 (D.D.C. 2006) (compiling cases). The determination of a reasonable processing rate is committed to the sound discretion of the district court. *See, e.g.*, *Colbert v. Fed. Bureau of Investigation*, No. 16-1790, 2018 WL 6299966, at *3 (D.D.C. Sept. 3, 2018). "Several factors inform the analysis, including the size and compelling need of the request compared to others, as well as the effect of the request on the [agency's] ability to review other FOIA requests." *Id.*

**ARGUMENT**

"Congress enacted FOIA to introduce transparency into government activities." *Quick v. Dep't of Commerce*, 775 F. Supp. 2d 174, 179 (D.D.C. 2011) (citation omitted). The law serves as a "means for citizens to know what the Government is up to" and "defines a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (cleaned up and citation omitted). The rights afforded under the FOIA are a bulwark to the "fundamental principle of public access" to records of the administrative state, which can often be

"shielded unnecessarily from public view . . . [by] possibly unwilling official hands." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989) (cleaned up and citation omitted).  In this case, however, the VA's slow-walking of records—or, more precisely, its unexplained dumps of duplicative email attachments—frustrates the FOIA's promise of prompt production and "the best of disinfectants": "sunlight" on the agency's operations. *Judicial Watch, Inc. v. Dep't of State*, 344 F. Supp. 3d 77, 78 (D.D.C. 2018) (quoting Justice Brandeis).  That fact, along with the VA's refusal to negotiate with AFPF, its insistence that AFPF has not sufficiently narrowed its requests, and the strong public interest in disclosure cut in favor of modification of the production order.

> **I.  The VA has not explained the high volume of duplicative material in its productions, which gives a false impression of its processing efforts.**

"[T]he glacial pace at which [the defendant has] been responding to [plaintiff's] requests shows an indifference to the commands of FOIA, and fails to afford accountability of government that the act requires."  *Am. Civil Liberties Union v. Dep't of Def.*, 339 F. Supp. 2d 501, 504 (S.D.N.Y. 2004).  "If the documents [at issue] are more of an embarrassment than a secret," then the VA has that much more of an obligation to accelerate its processing and, moreover, to undertake efforts to de-duplicate those records before release.  *Id.*  As it stands, the agency's *modus operandi* implies an aversion to disclosure of the records that AFPF seeks.

The VA has only released eighteen discrete records over the course of four months.  Mulvey Decl. ¶ 54.  Of these, only five are email messages.  Mulvey Decl. ¶ 54.  The remainder are attachments that, in large part, have been rendered out-of-context and apart from their "parent" email messages.  *See* Mulvey Decl. ¶¶ 30, 37, 42, 47, 52.  Although this could be the result of some quirk of the agency's e-discovery platform, Clearwell, the agency has never stated as much, and the statistical probability of such a vast quantity of stand-alone attachments being processed in sequential order should strike any reasonable person as vanishingly small.

5

In fact, most records that the VA has released are duplicates. Of the 1,767 pages of responsive records produced so far, only 269 pages have been non-duplicative after accounting for identical records released across multiple interim productions. *See* Mulvey Decl. ¶¶ 29, 35–36, 40–41, 45–46, 50–51; Mulvey Decl. Ex. 1. Roughly 85% of all pages disclosed to AFPF, in other words, have been duplicate copies. In September 2022, for example, the VA produced a two-page email *44* times, and over the course of three months (September – November) it produced a twenty-one-page PowerPoint file *42* times. *See* Mulvey Decl. Ex. 1.

This seemingly near-exclusive processing of duplicate pages extends to the agency's treatment of non-agency records, too. As part of its September 2022 interim production, the VA explained it "processed four hundred and thirty-two (432) pages" that were ultimately excluded as outside agency control. Mulvey Decl. ¶ 33. These pages represent *48* copies of the same nine-page journal article. Mulvey Decl. ¶ 34.[4] It is difficult to countenance any notion that the VA's processing of duplicate copies of a journal article—one that was excluded as a non-agency record to boot—required a significant investment of processing time. And the same can be said of the agency's release of hundreds of pages of duplicative PowerPoint slides. The numbers betray the agency's efforts and raise valid concerns about whether the VA is selectively processing records.

AFPF raised these concerns with the agency, but the VA has avoided any real response. *See, e.g.*, Mulvey Decl. ¶¶ 60–61, 64–67. The explanations it has attempted do not address the sort of duplication at hand. For example, the VA has confusingly claimed that de-duplication is only possible with "eyes-on review," and that a record marked as duplicate for one search may still be responsive to another. Mulvey Decl. ¶ 61(b)–(c). But here, all the duplicates are responsive

---

[4] One might surmise that the same type of duplication extends to non-responsive "items." The agency has not given a formal description of these records and merely suggested that pertain to Electronic Health Record Modernization, aging/eldercare, and budgetary matters. *See, e.g.*, Mulvey Decl. ¶ 59.

to the same search—Search # 4—and most have been released without any accompanying "parent" email. Mulvey Decl. ¶¶ 35, 37, 40, 42, 45, 47, 50, 52. The pages are not self-evidently "different versions" of a record, but quite literally identical copies. The Court should therefore order the agency not to count duplicative pages towards its monthly production requirement.

## II. The VA continues to avoid negotiating in any productive way with AFPF.

The Court is already aware of the parties' increasing inability to negotiate next steps in this case. *See, e.g.*, Joint Status Report, ECF No. 24. It is for that reason the Court stepped in to order a production schedule during the summer. Things have not improved over the past several months and, if anything, have worsened. When approached with even mundane matters, such as a request that the agency consistently report the number of "pages" processed each month, as opposed to "items," or to provide a description of the records excluded as non-responsive, the VA's response has been "No." *See, e.g.*, Mulvey Decl. ¶¶ 57 & 58.

In other instances, the agency has ignored AFPF's overtures. This was the case, for example, with AFPF's request for "exemplars" of the types of records the agency wanted AFPF to exclude from the scope of its FOIA requests. *See, e.g.*, Mulvey Decl. ¶¶ 62 & 63. These "exemplars" would have provided AFPF with an opportunity to determine whether it was truly interested in the records, or whether it could have agreed to place them outside the scope of the consolidated requests, thus reducing the universe of potentially responsive records. The agency never replied. Mulvey Decl. ¶ 63. Most recently, after the parties were unable to reach agreement in the November 29, 2022 Joint Status Report, AFPF sent the VA a four-part proposal that might serve as the basis for further negotiations; the agency ignored the proposal (not even bothering to acknowledge AFPF's email), never took AFPF up on its suggestion of a teleconference for negotiations, and also failed to reply to multiple follow-up inquiries. *See* Mulvey Decl. ¶¶ 64–68.

Ideally, in a FOIA case, the parties should cooperate and resolve their differences without judicial intervention. But, here, the VA appears to take the view that the only acceptable negotiation is a requester's acquiescence to an agency's demands for narrowing or, at best, preservation of the status quo. That view is inimical to the FOIA. Negotiation should be a two-way street, and AFPF seems to be driving alone.

### III. AFPF has made more than reasonable efforts to narrow its requests.

AFPF anticipates the VA's opposition to this motion will involve some claim that the agency has been working diligently on processing AFPF's requests, that it has dedicated an unprecedented amount of resources to this case, and that AFPF bears the burden of narrowing its requests further if it believes production is proceeding too slowly. *See, e.g.*, Mulvey Decl. ¶¶ 14 & 59. Yet AFPF has consistently worked to narrow the scope of its requests, refine the relevant key-work search commands, and accommodate the agency's requests without prejudicing its rights under the FOIA. Even a casual glance at the evidentiary record and the results of the VA's searches show how focused AFPF's requests are. *See* Mulvey Decl. ¶ 13.[5] When the agency initially uploaded the universe of potentially responsive records to Clearwell, it claimed approximately two terabytes of data were at issue; AFPF's refined search terms culled that universe to 52,780 "items" before de-duplication.[6] Mulvey Decl. ¶ 16(d); *see, e.g.*, Joint Status Report ¶ 6, ECF No. 22 ("According to the results of the latest refined searches . . . a total of 52,780 items (representing a combination of e-mail messages, e-mail attachments, and embedded items) are potentially responsive out of a total of 705,388 items (102,496 documents) uploaded into Clearwell.").

---

[5] Again, these numbers do not account for de-duplication. In May 2022, the VA reported it had run a simulated production, "which rendered, after de-duping, 30,531 items, rather than the approximately 50,000 items" reflected in prior correspondence. *See, e.g.*, Mulvey Decl. ¶ 15.

[6] This total number of "items" also includes a non-marginal number of "embedded" objects. *See* Mulvey Decl. ¶ 13.

AFPF has expressed willingness to narrow its requests even further, and it has proposed creative ways to ease the agency's administrative burden. In May 2022, for example, AFPF suggested the VA (1) make interim test productions to aid in further narrowing; (2) focus on processing email while reserving attachments for later; and (3) exclude attachments that do not return as "hits" to the revised key-word searches. *See* Mulvey Decl. ¶ 16(b). The agency rejected those ideas and offered no alternative proposals. AFPF also attempted to establish a prioritization scheme, which it believed the agency had agreed to follow, as reported to the Court. *See, e.g.*, Mulvey Decl. ¶¶ 21–24. Indeed, prioritizing the items of AFPF's requests and focusing the VA's efforts on searches that implicate fewer records—and records of greater interest to AFPF, *see, e.g.*, Mulvey Decl. ¶ 7(a)—would have "facilitated further discussion and potential narrowing." Mulvey Decl. ¶ 18. But the agency now refuses to honor AFPF's request based on its "prerogative" to process "in the order it feels is most efficient." Mulvey Decl. ¶ 61. Finally, as recently as two weeks ago, AFPF was prepared to consider the agency's "technological limitations" and exclude categories of records as the agency provided exemplars beforehand. *See* Mulvey Decl. ¶ 64. The agency never accepted AFPF's repeated invitations to discuss such matters.[7]

In the end, any argument that AFPF's requests impose an unreasonable burden on the VA's processing capabilities is unpersuasive as far as the Court's production order is concerned. The FOIA already provides a "safety valve" for voluminous requests with a stay for "exceptional circumstances." *Seavey*, 266 F. Supp. 3d at 246; *see* 5 U.S.C. § 552(a)(6)(C)(i). But the VA "has not invoked that statutory provision in this case," and its "desire for administrative convenience is simply not a valid justification for telling [AFPF] that [it] must wait decades" to receive the

---

[7] The VA's failure to respond to AFPF's overtures is even more perplexing in the wake of the agency's supposed discovery of a year's worth of email records that it "inadvertently" failed to identify when it executed searches earlier this year. *See* Mulvey Decl. ¶¶ 59–61.

requested records.  *Id.*  "Telling the requester 'You'll get the documents 15, or eight, years from now' amounts as a practical matter in most cases to saying 'regardless of whether you are entitled to the documents, we will not give them to you.'"  *Seavey*, 266 F. Supp. 3d at 246 (cleaned up and citation omitted).  There is scant evidence to suggest that a moderate increase in the VA's monthly production rate, as proposed by AFPF, will either "'monopolize' [the VA's] resources" or "delay the processing of smaller requests" from other parties.  *Id.*

To be sure, courts have looked to a 500-pages-per-month processing rate as something of a standard.  The D.C. Circuit, for example, has described that production rate as "reasonable" insofar as it "promote[s] efficient responses to a larger number of requesters."  *Nat'l Sec. Counselors v. Dep't of Justice*, 848 F.3d 467, 471–72 (D.C. Cir. 2017).  At the same time, the Circuit made clear the context of its holding.  Not only did it explain how the defendant-agency memorialized this processing rate as formal policy, but it "come forward with a reasonable, non-obstructionist explanation" for why "that limitation" did not run afoul of the letter or spirit of the FOIA.  *Id.* at 472.

The same cannot be said of the VA here.  The current 500-page-per-month production rate was voluntarily negotiated by the parties.  *See, e.g.*, Mulvey Decl. ¶ 19; Joint Status Report ¶ 4, ECF No. 23.  The VA's FOIA regulations do not address the question of processing rates, in or out of litigation.  *See* 38 C.F.R. pt. 1.  And there is no other evidence the agency applies that rate as a matter of policy.  Even if such evidence existed, AFPF has proffered its own evidence to underscore how the VA is processing an enormous number of duplicative email attachments that have been divorced from "parent" email records—a trend that suggests the agency may be obstructing prompt disclosure.

**IV. AFPF's requests concern a critical and newsworthy topic, and there is evidence of politicization of the VA's FOIA processes.**

Although AFPF did not move for expedited processing in its FOIA requests, the evidence is overwhelming that prompt production would serve the public interest. The records at issue touch on fundamental questions about the government's integrity in implementing the VCCP and regulating American veterans' timely access to quality healthcare. This case is hardly one of a requester seeking records for personal gain or profit. *See, e.g.*, *White v. Dep't of Justice*, 16 F.4th 539, 544 (7th Cir. 2021) (requester challenged production rate but sought records "to cast doubt on his own criminal convictions").

At the time AFPF filed its lawsuit, the VA had already faced repeated scandals over its mismanagement of patient-scheduling systems and wait-time data. *See* Mulvey Decl. ¶ 5 (citing Compl. ¶¶ 8–17). That scandal has not abated. AFPF's investigative research, which has been fueled by the agency records released in this case, continues to raise serious concerns about the VA circumventing the VA MISSION ACT and frustrating implementation of the VCCP. *See* Decl. of Kevin M. Schmidt ¶¶ 7 & 8. It seems the "VA continues to use what is called 'patient indicated date' instead of a veteran's 'date of request' for an appointment to calculate wait times." Schmidt Decl. ¶ 7. "This difference in calculating wait times not only creates data inaccuracies, but distorts eligibility for referral to community care and forces veterans to continue to wait in line at the VA." Schmidt Decl. ¶ 7. The VA Inspector General, for its part, has published a report that "discredits the public narrative seemingly advanced by the VA on the question of 'wait times' and the VCCP access standards." Schmidt Decl. ¶ 9. And Secretary McDonough himself has acknowledged "frustrat[ion]" over the wait-time question. Schmidt Decl. ¶ 10.

The matters implicated in the records sought by AFPF are not just of interest to government watchdogs or veterans seeking timely healthcare. *See* Schmidt Decl. ¶¶ 11 & 12. They are also

11

of immense interest to Congress. Yet the VA has frustrated legislative oversight, declining to participate in a hearing about implementation of the MISSION Act and blocking the disclosure of records to Senator Bill Cassidy. *See* Schmidt Decl. ¶¶13 & 14. AFPF's FOIA requests are the only real mechanism for holding the VA accountable on this issue at this time.

Finally, the unresolved question of the nature of the VA's "substantial interest" process, and its influence on the content and timeliness of the agency's productions, warrants mention. The VA had conceded that AFPF's requests were subject to politicized review before the filing of this lawsuit, and the agency has also admitted that AFPF's requests are now subject to a special litigation review process. *See* Schmidt Decl. ¶ 16; Mulvey Decl. ¶¶ 69–71; *see also* Mulvey Decl. Ex. 2. Any process that accommodates non-FOIA components or political appointees as part of the disclosure process is liable to delay production or influence the treatment of records. *See* Schmidt Decl. ¶ 17; Mulvey Decl. ¶ 72. And the VA has a poor historical track record as far as allegations of FOIA politicization are concerned. *See* Schmidt Dec. ¶¶ 18–19. At the least, the agency's efforts last year—in the wake of its first production in this case—to accuse an unnamed requester of "selectively us[ing]" records to shine light on the implementation of the MISSION Act raises substantive concerns about the processing of AFPF's FOIA requests over the course of the past several months. *See* Schmidt Decl. ¶ 20; Mulvey Decl. ¶ 73. All this warrants consideration by the Court.

## CONCLUSION

For the foregoing reasons, AFPF respectfully requests the Court to grant the instant motion and modify its production order by requiring the VA to process at least 750 pages of non-duplicative, responsive agency records every month—or more, if the Court deems it appropriate. A proposed order is attached.

Dated: December 16, 2022                    Respectfully submitted,

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey
D.C. Bar No. 1024362
Eric R. Bolinder
D.C. Bar No. 1028335

AMERICANS FOR PROSPERITY
FOUNDATION
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Telephone: (571) 444-2841
rmulvey@afphq.org
ebolinder@afphq.org

*Counsel for Plaintiff*