## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICANS FOR PROSPERITY FOUNDATION, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Civil Action No. 21-1954 (RC) |
| | ) |
| U.S. DEPARTMENT OF VETERANS AFFAIRS, | ) |
| | ) |
| *Defendant*. | ) |
| | ) |

### DECLARATION OF RYAN P. MULVEY

I, Ryan P. Mulvey, pursuant to 28 U.S.C. § 1746, do hereby declare:

1.     I am Policy Counsel at Americans for Prosperity Foundation ("AFPF").  My responsibilities include, among other things, working on matters involving the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  I represent Plaintiff AFPF in this lawsuit.

2.     I submit this declaration in support of AFPF's motion for a modification to the Court's production order.  The statements contained herein are based upon knowledge that I have acquired in the performance of my official duties, information provided to me in my official capacity by other AFPF personnel, and my first-hand experience reviewing and analyzing relevant records maintained by AFPF during the ordinary course of its business.

### AFPF's FOIA Requests

3.     This lawsuit concerns fifteen FOIA requests submitted by AFPF to various offices and components of Defendant Department of Veterans Affairs ("VA").  *See generally* Compl. ¶¶ 25–112, ECF No. 1; Compl. Exs. 10–36, ECF Nos. 1-10–1-36.

4.     AFPF's requests seek records that reflect how the agency is implementing the VA MISSION Act of 2018 and the Veterans Community Care Program ("VCCP").  With its requests,

AFPF aims to better understand how changes contained in the VCCP's access standards for community care are reflected in current appointment and wait-time data at various VA medical centers around the country, especially considering the COVID-19 pandemic.  AFPF also aims to bring to light internal guidance or other directives that may have been issued by top VA officials or the White House vis-à-vis proper interpretation of the VA's VCCP regulations.

5.     At the time of the Complaint, the VA had already faced repeated scandal over its mismanagement of patient scheduling systems and wait-time data. *See, e.g.*, Compl. ¶¶ 8–17.  That controversy has continued to the present day, as detailed in the Declaration of Kevin M. Schmidt, which AFPF has also filed with the instant motion.

### The Parties' Deliberations Through July 2022

6.     On November 19, 2021, following a series of initial conversations, *see* Joint Status Reports, ECF Nos. 11 & 12, the VA provided an interim response to AFPF's consolidated FOIA requests and released all non-exempt records or portions thereof, apart from email messages and attachments.  The parties also resolved certain matters regarding the Office of Community Care Field Guidebook, as well as an apparent discrepancy in records disclosed by the Northern Arizona VA Health Care System.  *See* Joint Status Report ¶ 3, ECF No. 14.  They otherwise agreed that all non-email records had been processed and were no longer at issue.

7.     At the same time, the parties started to negotiate the VA's separate search for responsive email records:

a.     By email, dated September 29, 2021, AFPF asked the agency to prioritize the various items of the consolidated FOIA requests, focusing "first on Item 4 of the HQ request and, specifically, records of communications between the <u>Office of the Secretary</u> and/or the <u>Office of the General Counsel</u> and any of the named White House components

(OMB, Domestic Policy Council, and Office of White House Counsel)."  Opposing counsel subsequently replied that the VA "anticipated" these "communications . . . may be protected from disclosure under FOIA Exemption 5 (attorney-client privilege)."

b.    By late November 2021, the parties had an initial list of custodians and proposed search terms.  These initial lists served as the basis for further negotiations.

c.    In December 2021, in AFPF's view, the parties agreed on a list of twenty-three records custodians.  Although opposing counsel was unwilling to represent this jointly, the agency nevertheless agreed to inform the Court that the VA's Office of Information and Technology ("OI&T") was pulling relevant accounts and estimated it would "take approximately six weeks to prepare the email accounts for search and processing."  Joint Status Report ¶ 3, ECF No. 15.

d.    By email, dated January 31, 2022, AFPF confirmed it was amenable to the VA's proposed initial search commands for four of the five items of the consolidated FOIA requests.  AFPF also proposed a search command for the fifth and final request item.

e.    By email, dated February 7, 2021, the VA asked for clarification regarding one of the search commands.  The agency also explained it was "putting in the search terms" and would "get back to [AFPF] after e-discovery responds[.]"  AFPF responded to the VA's request for clarification the next day.

8.    By mid-February 2022, it became increasingly difficult for AFPF to obtain timely information concerning the status of the agency's retrieval of custodial accounts and its initial "culling" based on the agreed-upon search commands.  In the parties' February 18, 2022 Joint Status Report, for example, AFPF alerted the Court to its concerns:

> [T]he agency has been unable to provide an estimated date of completion for its initial searches. Moreover, although Defendant represents it has completed preliminary searches for "some" of the custodian mailboxes, it does not explain how many of those mailboxes have been searched, how many remain, and the volume of records thus far identified as potentially responsive. . . . The parties' deliberations . . . have been ongoing for at least four months. Plaintiff has taken an eminently reasonable position . . . [but] relatively basic information about the status of Defendant's searches is essential to productive negotiation moving forward.

Joint Status Report ¶ 11(a)(i), (iv), ECF No. 17.

9.      On February 28, 2022, the parties discussed the treatment of a "distribution mailbox" and agreed on a solution. *See* Joint Status Report ¶ 8, ECF No. 18.

10.      By email, dated March 11, 2022, agency counsel memorialized a conversation between the parties. That email explained the VA had completed initial searches of the mailboxes of twenty-two of the twenty-three records custodians, but it had not used the agreed-upon search commands. The agency instead applied "discrete" terms—that is, it broke up the search commands and ran each individual term as its own search. This deviation from the agreed-upon search, which agency counsel conceded was not "the best course of action," vastly expanded the volume of responsive material that needed to be uploaded to the VA's e-discovery platform for further review. The VA never contacted AFPF regarding the agency's decision to modify the agreed-upon search commands, nor did it provide contemporaneous updates about this undertaking. The agency's memorialization correctly noted that AFPF agreed it would not seek to "expand[] the search terms" in the future. The VA later executed the correct search commands.

11.      By email, dated April 7, 2022, the VA provided AFPF with summary reports reflecting the initial results of the agency's execution of the agreed-upon keyword searches. These reports showed the total number of potentially responsive emails and attachments, as well as the number of "hits" for each custodial mailbox. Joint Status Report ¶ 11, ECF No. 19.

12.    The parties continued to discuss the technological limitations of Clearwell (the VA's e-discovery platform), the timeline for the decryption of several remaining email messages and attachments, and related issues (such as the VA's definition of a "record"). *See, e.g.*, Joint Status Report ¶ 11, ECF No. 20.  By email, dated April 29, 2022, AFPF proposed a series of revised search commands for the various items of its consolidated requests. *See* Joint Status Report ¶ 12, ECF No. 21.  At the same time, AFPF continued to express concern over the VA's apparent equivocation when referring to "records," "items," "documents," and "document families."

13.    The VA reported the results of the revised searches on May 16, 2022.  Those results are reproduced in the following table:

| Search Item | Search Terms | Custodians | Email Messages | Attachments | Embedded Items | Total |
|---|---|---|---|---|---|---|
| Search #1 **HQ FOIA ITEM 2** | [("access to care" OR "patient access") AND ("data" OR "numbers")] AND ("website" OR "site" OR "portal") AND ("transfer" OR "move" OR "shift" OR "relocate" OR "create date" OR "inspector general") | • Kirsh<br>• Lieberman<br>• Hudson<br>• Oshinski<br>• Stone | 560 | 6,973 | 982 | 8,515 |
| Search #2 **HQ FOIA ITEM 3a & 4-5 and VAMCs FOIA Item 10a** **(W/O CACMI)** | ("MISSION Act" OR "VCCP" OR "Veterans Community Care") AND ("date of request" OR "request date" OR "patient preferred date" OR "create date" OR "clinically indicated date" OR "patient indicated date" OR "wait time standard" OR "access standard" OR "file entry date" OR "community care eligibility") AND [("guidance" OR "direct*" OR "policy" OR "memo*") OR ("inquiry" OR "request" OR "question" OR "inspector general")] | • Kirsh<br>• Upton<br>• Matthews<br>• Boyd<br>• Cunningham<br>• Lieberman<br>• Greenstone<br>• MacDonald<br>• Tucker<br>• Bradsher<br>• Sauber<br>• Hudson<br>• Blauert<br>• Henson<br>• Powers<br>• Raftery<br>• Stone<br>• Clancy<br>• Oshinksi<br>• Wilkie (x2)<br>• McDonough (x2) | 515 | 5,065 | 2,788 | 8,368 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Search #3 **HQ FOIA ITEM 3a & 4-5 and VAMCs FOIA Item 10a** (w/VHACACMI) | ("MISSION Act" OR "VCCP" OR "Veterans Community Care") AND ("date of request" OR "request date" OR "patient preferred date" OR "create date" OR "clinically indicated date" OR "patient indicated date" OR "wait time standard" OR "access standard" OR "file entry date" OR "community care eligibility") AND [("guidance" OR "direct*" OR "policy" OR "memo*") OR ("inquiry" OR "request" OR "question" OR "inspector general")] AND "VHACACMI@va.gov" | • Mary Fields | 0 | 0 | 0 | 0 |
| Search #4 **HQ FOIA ITEM 3b & 4-5 and VAMCs FOIA ITEM 10b** | ("VCCP" OR "Community Care" OR "MISSION Act") AND ("access standards" OR "wait times") AND [("method*" OR "calculat*") AND ("process" OR "procedure" OR "direct*" OR "policy" OR "memo*")] | • Upton<br>• Matthews<br>• Boyd<br>• Cunningham<br>• Lieberman<br>• Greenstone<br>• MacDonald<br>• Tucker<br>• Bradsher<br>• Sauber<br>• Hudson<br>• Blauert<br>• Powers<br>• Henson<br>• Raftery<br>• Stone<br>• Clancy<br>• Oshinski<br>• Wilkie (x2)<br>• McDonough (x2) | 929 | 12,209 | 175 | 13,313 |

| Search #5 **HQ FOIA ITEM 3c & 4-5 and VAMCs FOIA ITEM 10c** | [("community care wait time") AND ("eligible" OR "eligibility")] AND ("script" OR "referral coordination initiative") | • Kirsh<br>• Upton<br>• Matthews<br>• Boyd<br>• Cunningham<br>• Lieberman<br>• Greenstone<br>• MacDonald<br>• Tucker<br>• Bradsher<br>• Sauber<br>• Hudson<br>• Blauert<br>• Henson<br>• Powers<br>• Raftery<br>• Stone<br>• Clancy<br>• Oshinksi<br>• Wilkie (x2)<br>• McDonough (x2) | 5 | 10 | 0 | 15 |
| Search #6 **HQ FOIA ITEM 3c & 4-5 and VAMCs FOIA ITEM 10c (w/VHACACMI)** | (("community care wait time") AND ("eligible" OR "eligibility") AND ("eligible" OR "eligibility")) AND ("script" OR "referral coordination initiative") AND vhacacmi@va.gov | • Mary Fields | 0 | 0 | 0 | 0 |
| Search #7 **HQ FOIA ITEM 3d & 4-5 and VAMCs FOIA ITEM 10d** | [("COVID*" OR "pandemic") AND ("VCCP" OR "community care" OR "MISSION Act")] AND ("referral management" OR "consult management" OR "eligibility" OR "wait time standard" OR "access standard" OR "pause") | • Kirsh<br>• Matthews<br>• Boyd<br>• Sauber<br>• Hudson<br>• Hipolit<br>• Blauert<br>• Upton<br>• Tucker<br>• Bradsher<br>• Powers<br>• Henson<br>• Raftery<br>• Stone<br>• Wilkie (x2)<br>• McDonough (x2) | 1,587 | 19,629 | 1,353 | 22,569 |

14.     In the same correspondence, the VA advised AFPF that the agency believed the material at issue was "far too voluminous" and requested that AFPF "suggest a more narrow set of [key-word searches.]"

15.     By email, dated May 23, 2022, the agency reported further that it had run a "simulate[d] production . . . which rendered, after de-duping, 30,531 items, rather than the approximately 50,000 items" reflected in prior correspondence.  (The revised searches had returned 52,780 "items" before de-duplication.  *See, e.g.*, Joint Status Report ¶ 6, ECF No. 22.)

16.     The same day, AFPF provided the agency with a detailed response and proposal for further processing.  Among other things:

    a.     AFPF memorialized that, "the agency has maintained it will refuse to conduct any further review until it is satisfied with the number of records to be processed," despite the fact "there is no basis in the FOIA for that position . . . and the agency refuses to provide any target figure for what it even considers acceptable."

    b.     AFPF explained it had "been creative with offering reasonable solutions for alleviating the agency's burden at the processing stage," including (1) suggesting "interim 'test' productions for each request item to aid in further narrowing"; (2) "processing only emails and reserving select attachments for later"; and (3) "excluding attachments that do not return as 'hits' to the revised key word searches—a step that would *significantly* reduce the volume of materials at hand."  AFPF noted the VA's rejection of these proposals.

    c.     AFPF also explained the "simulated production," which "resulted in the elimination of approximately 23,000 potential responsive 'items,'" highlighted the likely inflated estimate of the burden of processing, as did the "addition of 6,298 'embedded items.'"

d.    Finally, AFPF emphasized it had already extensively narrowed its request, despite no legal obligation to do so, and this had reduced the volume of records at issue from what the agency initially claimed was approximately "2TB+" of data down to "52,780 'items' (pre-deduplication)."

17.    By e-mail, dated June 1, 2022, the VA responded to AFPF's e-mail.  In relevant part, it did not address whether the agency was refusing to process records or if it was willing to reach some sort of compromise short of requiring AFPF to further narrow its FOIA requests.  The VA instead sought clarification whether AFPF believed "the agency should begin processing now, notwithstanding the tremendous size of the undertaking[.]"    The VA also confirmed that decryption of a few remaining files was completed.

18.    By email, dated June 2, 2022, AFPF reiterated the major points set out in its prior correspondence.  It proposed—in yet another attempt at compromise—that the parties agree to prioritize the various items of AFPF's consolidated requests according to the seven searches set out in the agency's May 16, 2022 correspondence. *See supra* at ¶ 13.  Specifically, AFPF proposed the VA first process records responsive to Searches # 1, 2, and 5.  AFPF suggested delaying the processing of records responsive to Searches # 4 and 7, which made up "approximately 2/3 of the total universe of potentially responsive materials," so as to facilitate further discussion and potential narrowing of that portion of AFPF's requests.  Finally, AFPF explained the VA could issue a partial determination vis-à-vis Searches # 3 and 6, as there were no potentially responsive records identified during the execution of the refined searches.

19.    After several requests for an update, the VA clarified its position by email, dated June 13, 2022.  The agency indicated it would "agree to proceed with the results of the last key

word search . . . which produced a total of 30,531 reviewable items after de-duplication," and that it could "complete review of those items at a rate of 500 pages per month."

20.     The same day, AFPF requested clarification as to whether the VA would accept the proposal to "bifurcate" and prioritize the various items of the consolidated FOIA requests.  AFPF also sought clarification regarding the nature of Clearwell's de-duplication and the calculation of "pages" in the agency's proposed processing rate.  *See* Joint Status Report ¶ 7(a), ECF No. 24.

21.     By email, dated June 27, 2022, the VA provided its updated position.  Among other things, it agreed "not to count non-responsive logos as separate items toward the monthly 500-page production requirement."  It also agreed, "[a]fter internal discussion," to "consider" AFPF's prioritization scheme, while reserving the right to "process in the order that it feels is the most efficient, effective, and best[.]"  The agency noted "processing in the order proposed won't necessarily save time on the back end in case AFPF wants to further 'refine' the KWSs[.]"

22.     The next day, AFPF sent the VA an email memorializing AFPF's understanding that the agency had "agree[d] to process the various items of the consolidated requests according to the prioritization previously provided (*i.e.*, starting with Searches 1, 2, and 5)."  AFPF explained that, "if the VA determines to abandon the agreed-upon prioritization, then Plaintiff would request advance notice with the explanation for why the agency considers the alternative to be more efficient."  Finally, AFPF noted "[t]he proposed compromise on embedded items is acceptable."

23.     Later that week, on July 1, 2022, the parties filed a joint status report.  Although they could not agree on a proposed initial production date—despite AFPF's requests to negotiate one—they did reach agreement on various other matters, including a representation to the Court that "[t]he parties have agreed to a prioritization scheme for the further processing of Plaintiff's requests[.]"  Joint Status Report ¶ 4, ECF No. 23.  This joint status report was filed by opposing

counsel at 4:02 PM, and opposing counsel confirmed with AFPF by email that he had communicated with agency counsel prior to finalizing the agreed-upon content. Agency counsel raised only a single objection to "commit[ting] to a date certain" for the start of productions.

24.     The parties' negotiations continued to deteriorate after the filing of the July 1, 2022 Joint Status Report. In that report, AFPF agreed to delay an agreement on a production schedule by a week to facilitate the agency's internal deliberations. Yet over the course of the next week, the VA failed to engage in any negotiation. On July 8, 2022, opposing counsel provided AFPF with a draft status report that contained a proposed production date of August 31, 2022. (Notably, the VA's initial draft reiterated that the parties had reached agreement on a prioritization scheme.) In a later email containing a revised draft, opposing counsel stated the VA had never agreed on a prioritization scheme and there was no "meeting of the minds on this issue." AFPF has already provided the Court with a general description of the events immediately preceding the filing of this status report. *See* Joint Status Report ¶ 7(c), ECF No. 24.

### The VA's Interim Email Productions

25.     On July 11, 2022, the Court ordered the VA "to process 500 pages per month and produce responsive documents within 30 days of the date of [the] order, and on that same date each month until production is complete." Minute Order (July 11, 2022). On its own terms, the Court's order required the VA to produce its first interim production on or before August 10, 2022, and to release further productions in subsequent months on a date determinate—namely, the tenth of each calendar month.

26.     The VA has termed these latest releases "email productions" because they pertain to the searches of the email accounts of the agreed-upon records custodians.

### *August 2022 Interim Production*

27.     The VA's August 2022 interim production was due on August 10, 2022.

28.     By email, dated August 11, 2022, opposing counsel provided AFPF with the agency's first interim production.  The VA offered its "apologies for miscalculating the due date." Opposing counsel suggested that "the extra day resulted in more records being reviewed."

29.     In its cover letter, the VA explained its response pertained to Search # 1.  The agency advised it had "processed 5,021 items" and was releasing "six (6) pages."  It also noted "three (3) pages were found to be a logo and were not processed[.]"  The agency withheld in part the six-page record under Exemption 5, in conjunction with the deliberative-process and attorney-work-product privileges.

30.     There were no email messages included in the interim production, and the VA did not provide the "parent" email message for the "Talking Points" document it released.

### *September 2022 Interim Production*

31.     The VA's September 2022 interim production was due on September 10, 2022

32.     Two days later, by email, dated September 12, 2022 (6:19 PM), opposing counsel advised AFPF that the production had been posted to the agency's FOIA Reading Room.

33.     In its cover letter, the VA explained its response pertained to Searches # 1 and 4. With respect to Search # 1, the agency "processed four hundred and thirty-two (432) pages," which consisted of "multiple copies of an article from the Health Affairs Journal[.]"  The VA explained "this article is not an agency record[.]"  The agency also explained, in the alternative, that it would "withhold release of the article under FOIA Exemption 4[.]"

34.     I accessed the publicly available abstract for the journal article at the link provided by the VA in its cover letter.  Upon review of the information online, and details about the edition

in which the article was published, I was able to determine that the original article—"Comparing Complication Rates After Elective Total Knee Arthroplasty Delivered Or Purchased By The VA"—was 9 pages long. This means the VA excluded 48 copies of a 9-page article. The agency did not produce any "parent" email messages to which the journal article was attached.

35.     With respect to Search # 4, the VA "processed four thousand three hundred and fifty-two (4352) items as non-responsive," as well as "one hundred and ninety-two (192) responsive pages." The agency withheld relevant records in part under Exemption 6. The VA did not provide any description of the 4,352 "items" it considered "non-responsive."

36.     After reviewing the records that comprise the VA's interim production, I determined the agency released 3 unique records, totaling 43 pages. The remaining 149 pages— or 78% of the interim production—were duplicate copies of released records.

37.     Neither of the non-email records included in the interim production—presumably, attachments—were released with their "parent" email messages. The only email message included in the production was a two-page notice that was released forty-four times.

### October 2022 Interim Production

38.     The VA's October 2022 interim production was due on October 10, 2022.

39.     The next day, by email, dated October 11, 2022 (6:13 PM), agency counsel advised AFPF that the production had been posted to the agency's FOIA Reading Room.

40.     In its cover letter, the VA explained its response pertained to Search #4. The agency "processed one hundred and twenty-seven items (127) as non-responsive," excluded "9 images (2 black circles, 2 green circles, 2 red circles, 2 yellow circles) and 1 VA logo," and released "five hundred and eight (508) responsive pages[.]" The agency withheld relevant records in part under

Exemption 6. The VA did not provide any description of the 127 "items" it treated as "non-responsive."

41.     After reviewing the records that comprise the VA's interim production, I determined the agency released 8 unique records, totaling 92 pages. Of those 8 records, one had been released in an earlier interim production. The remaining 416 pages—or 82% of the interim production—were duplicate copies of released records.

42.     Although several of the records and duplicates included in this production can be associated with "parent" email messages, most of the records—including 14 copies of a September 2021 PowerPoint file—were released as stand-alone attachments.

### *November 2022 Interim Production*

43.     The VA's November 2022 interim production was due on November 10, 2022.

44.     The VA timely produced the November 2022 production. By e-mail, dated November 10, 2022 (6:51 PM), agency counsel advised AFPF that the production had been posted to the agency's FOIA Reading Room.

45.     In its cover letter, the VA explained its response pertained to Search #4. The agency "processed five hundred and thirty-eight (538) responsive pages[.]" The agency withheld relevant records in part under Exemption 6.

46.     After reviewing the records that comprise the VA's interim production, I determined the agency released 5 unique records, totaling 33 pages. Of those 5 records, 4 had been released in earlier interim productions. The remaining 505 pages—or 94% of the interim production—were duplicate copies of released records.

47.     Although several of the records and duplicates included in this production can be associated with "parent" email messages, most of the records—namely, 24 copies of a September 2021 PowerPoint file—were released as stand-alone attachments.

### December 2022 Interim Production

48.     The VA's December 2022 interim production was due on December 10, 2022.

49.     Two days later, by email, dated December 12, 2022 (7:06 PM), agency counsel advised AFPF that the production had been posted to the agency's FOIA Reading Room.

50.     In its cover letter, the VA explained its response pertained to Search #4.  The agency "processed twenty-six (26) pages as non-response," excluded "two (2) blank pages," and released "five hundred and twenty-three (523) responsive pages[.]"   It withheld relevant records in part under Exemption 5, in conjunction with the deliberative-process privilege, and Exemption 6.

51.     After reviewing the records that comprise the VA's interim production, I determined the agency released 6 unique records, totaling 147 pages.  The remaining 376 pages— or 72% of the interim production—were duplicate copies of released records.

52.     The VA released a single, undated email, which included a PowerPoint file as an attachment.  That file was included in the production.  The "parent" email messages for the other PowerPoint files were not included in the production.

### Summary of Interim Productions – August to December 2022

53.     The foregoing analysis of the VA's interim productions to date is summarized in an index that I have prepared and attached as **Exhibit 1**.

54.     In total, the VA has released 18 records, including 5 email messages.  *See* Ex. 1.

55.     The bulk of what the agency has produced has been duplicative attachments.  For example, over the course of three months, the VA released the same 21-page PowerPoint

presentation 42 times.  *See* Ex. 1.  And in September 2022, it released a two-page email message

44 times.  *See* Ex. 1.

56.    The agency has not provided any real explanation for why it continues to produce

such a volume of duplicative material, or why it has not released the email messages to which

attachments are connected.

### The Parties' Negotiations Since July 2022

57.    By email, dated August 25, 2022, AFPF alerted the VA to several issues arising

from the agency's first interim production.

a.    *First*, AFPF requested that the agency indicate the number of "pages"

processed each month, rather than "items."

b.    *Second*, AFPF clarified the parties' agreement over the treatment of "logo"-

type embedded "items."

c.    *Third*, AFPF requested the VA "provide a general description of the 'items'

determined to be non-responsive and continue to do so moving forward in future

production letters[.]"

d.    *Fourth*, AFPF noted its challenge to the use of Exemption 5 and the absence

of any foreseeable-harm analysis in the agency's interim response letter.

58.    By email, dated August 30, 2022, the VA provided its response.  Among other

things, the VA "decline[d] to provide a page count."  With respect to describing non-responsive

records, it stated it "is not required to do so."  At the same time, while not agreeing to provide a

description of non-responsive records in its production letters, and "in a good faith effort to address

[AFPF's] stated concerns," the agency noted "there were a lot of non-responsive records pertaining

to Electronic Health Record Modernization," "aging/eldercare," and "some budget records."

59.    By email, dated November 8, 2022, the VA notified AFPF that it had "recently realized" that the "total pool of items for review is significantly more than had been previously estimated" because "[t]he previous count was not inclusive of the records from the year 2020." The agency reported the "correct total number of items is 139,709," including "items already processed, as well as logos that won't be processed[.]"  The VA invited AFPF to "narrow[] KWSs, custodians, or date ranges," and it indicated its willingness to exclude certain types of records.

60.    AFPF immediately responded and advised the agency that it would take its "email under consideration."  AFPF provided a further response by email, dated November 14, 2022. AFPF expressed confusion over the agency's notice of newly disclosed records and explained "the only way 87,929 additional 'items' could have been missed was if the agency failed to apply the correct time-period limitations for Searches 2–7."  In addition to asking for clarification about what, exactly, the agency had (or had not) done, AFPF expressed a willingness to "exclud[e] certain categories of records . . . pending clarification" about the newly discovered "items."  AFPF also highlighted the number of duplicative records in the interim email productions, and the apparent fact that the VA was separating attachments from "parent" emails.  Finally, AFPF noted "the agency has not followed the prioritization scheme."

61.    The VA did not respond to AFPF's email until the day after Thanksgiving, November 25, 2022.

a.    The agency conceded it had "inadvertently" run the agreed-upon search commands "only for the year 2021."

b.    The agency attempted an explanation for why it could not de-duplicate records from the productions: "[U]nless an attachment is part of the same actual email that appears multiple times in different senders' mailboxes, there is no way to tell if it is actually

the same record, or different versions of the record (e.g., final version vs. draft, or clean copy vs. annotated) without doing an eyes-on review."

    c.    The agency also explained "if an item is marked responsive during one search, then it is easily excluded from a responsiveness review in any subsequent searches, because the item will need to be further processed for potential redactions whether or not it is responsive in additional searches."

    d.    Finally, the VA protested it did "not appreciate getting sandbagged with long, speculative, one-sided proposed narratives for a JSR right before it's due[.]" It stated it "never agreed to [AFPF's] suggested prioritization scheme" and would "process the records in the order that it feels is most efficient," which it claimed was its "prerogative."

62.    AFPF responded to the VA on the morning of the next business day, November 28, 2022.

    a.    AFPF reiterated it was not "categorically opposed" to excluding certain types of records, and it gave consent to exclude "medical journals or other paywalled academic materials moving forward." As for the further exclusion of records, AFPF explained it needed to "review some exemplars (or an explanation for withholding of the type of record)."

    b.    AFPF emphasized it "has repeatedly offered proposals for processing, none of which the agency has been willing to seriously entertain."

    c.    AFPF took issue with the agency's characterization of the negotiations prior to previous status reports. It explained it "consistently attempted to raise matters . . . in advance of any JSR," but "the agency has not always been timely in its responses, and it

frequently lacks available personnel near filing to approve any sort of compromise or joint representation."

        d.      With respect to the November status report, AFPF made clear it "would like to reach agreement about a proposal for further processing[.]"  AFPF indicated it "would need the agency to honor the prioritization scheme" and consider "increasing the monthly production rate."  In case the parties could not reach some middle ground, "separate sections reflecting each party's position and recommendation" would be necessary.

63.      The VA's next substantive response was at 12:17 PM on November 29, 2022—the date of filing for the November 2022 Joint Status Report.  The agency did not engage with any of AFPF's proposals but proposed the status quo in a draft status report.  AFPF provided a revised draft with separate positions for each party.  Over the course of the day, the VA declined to join any status report that included separate positions or any request for "the Court to act."  Even after the parties tentatively agreed to ask for a status conference, the agency objected to the inclusion of an explanation—joint or separate—for why such a conference was necessary.  At one point, the agency did provide an explanation of its position, but it was unwilling to allow AFPF to modify further its position in the same draft.  In the end, the parties agreed to propose another status report in a week's time.  AFPF agreed to this course of action with the understanding that the parties would attempt to negotiate further proceedings after the agency had time to solidify its position.

64.      By email, dated November 30, 2022, AFPF sent the VA a four-part proposal.

        a.      *First*, AFPF requested "[t]he agency adhere to a prioritization scheme that involves processing records responsive to Searches 2 and 5 before the remaining searches, notwithstanding the parties' disagreement about what was or was not previously agreed to in the July 1 JSR."

b. *Second*, AFPF requested "[t]he agency refrain from separating attachments from parent emails during processing."

c. *Third*, AFPF requested "a sample record for each category of records [the VA] proposes that Plaintiff exclude," namely, "Electronic Health Record Modernization records, aging/eldercare records, and OI&T budget records."

d. *Fourth*, AFPF invited the VA to "discuss ways to avoid the production of duplicative records," especially in light of "technological limitations" from which the agency might suffer.

65. AFPF explained it "would like to discuss these proposals . . . over the phone." But it noted, "[i]f the agency is unwilling to negotiate," then AFPF would propose each party provide a representation in the upcoming status report for why it believes a status conference is necessary.

66. The VA did not respond to AFPF's November 30, 2022 email.

67. The VA also did not respond to AFPF's follow-up inquiries on December 2, 2022 and December 5, 2022.

68. On December 5, 2022—a day ahead of the filing deadline for the December 2022 joint status report—AFPF provided the VA with a draft containing AFPF's position. Ultimately, the parties decided to brief the question of whether the Court should modify its production order. *See* Joint Status Report ¶ 4, ECF No. 27.

### The Admitted Influence of Politicized FOIA Review at the VA

69. The VA admits that AFPF's FOIA requests were subject to political review before the filing of this lawsuit. *See* Compl. Ex. 9, ECF No. 01-09; Compl. ¶¶ 18–24; Answer ¶¶ 22 & 23, ECF No. 10.

70.    The VA also admits that, since "the filing of [AFPF's] Complaint," FOIA requests have been subject to a similar "substantial interest" review for "requests that are subject to federal litigation[.]"  Answer ¶ 22; *see id.* ¶ 23.

71.    As part of its Answer, the VA directed the Court to a copy of the agency's current "substantial interest" memorandum.  I have attached a true and correct copy of this memorandum, which is available online in the VA's FOIA Reading Room, as **Exhibit 2**.

72.    In my experience, "sensitive" or "substantial interest" review—or other types of political review by non-FOIA components or officials within an agency—can significantly delay the processing of a request or result in inappropriate intervention to block or slow-walk the disclosure of records, or the review of potential responsive material.

73.    There has been notably media coverage related to this case and AFPF's findings based on the records produced by the VA.  The agency has responded, in part, by publicly implying in an opinion editorial that an unnamed requester—or groups of requesters—have "selectively used" records released under the FOIA "to support the false assertion [that the Veterans Health Administration] is not following the MISSION Act."  Steven Lieberman, *Veterans Health Administration increases care provided under MISSION Act*, The Hill, Nov. 22, 2021, https://thehill.com/opinion/healthcare/582583-veterans-health-administration-increases-care-provided-under-mission-act.  Although the opinion editorial does not identify a requester by name, the facts discussed by the author—then-Acting Under Secretary for Health Dr. Steven L. Lieberman—and the timing of publication strongly imply the piece was directed at AFPF.

74.    More recently, facts have come to light that undercut the public narrative advanced by the VA, including a report by the VA Inspector General that highlighted the confusing and misleading methodologies and data employed by the agency in its calculation of patient wait times.

*See, e.g.*, Leo Shane, *VA secretary promises improvements in medical wait time data*, Military Times, Apr. 8, 2022, https://www.militarytimes.com/veterans/2022/04/08/va-secretary-promises-improvements-in-medical-wait-time-data; *see generally* Kevin Schmidt, *8 years after scandal, VA is still untruthful about wait times for veteran care*, Ariz. Cent., Apr. 26, 2022, https://www.azcentral.com/story/opinion/op-ed/2022/04/26/va-still-fudging-wait-times-veteran-care-years-after-scandal/7415443001.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Ryan P. Mulvey
Executed this 16th day of December 2022

# Exhibit 1

# INDEX OF UNIQUE RECORDS – AUGUST 2022 TO DECEMBER 2022

*Americans for Prosperity Foundation v. Department of Veterans Affairs*, No. 21-1954 (D.D.C.)

## August 2022 Interim Production

| Record No. | Bates Nos. | Treatment | Description | Duplicates |
|---|---|---|---|---|
| 1 | 1–6 | RIP – (b)(5) | "Average Wait Time Calculation Change to Better Reflect Veteran Experience Talking Points" | n/a |

## September 2022 Interim Production

| Record No. | Bates Nos. | Treatment | Description | Duplicates |
|---|---|---|---|---|
| 1 | 7–26 | RIP – (b)(6) | PowerPoint: "Welcome to Community Care-Decisions Support Tool (DST) Office Hours" | n/a |
| 2 | 27–47 | RIF | PowerPoint: "MISSION Act Quality Standards and Related Activities" (09/01/21) | 3 |
| 3 | 111–112 | RIP – (b)(6) | Jan. 5, 2021 email (unclear if attachment included) | 43 |

## October 2022 Interim Production

| Record No. | Bates Nos. | Treatment | Description | Duplicates |
|---|---|---|---|---|
| 1 | 193–217 | RIF | VCCP "Vision and Implementation Plan" (03/21) | 1 |
| 2 | 243–263 | RIF | PowerPoint: "MISSION Act Quality Standards and Related Activities" (09/01/21) | 13 |
| 3 | 264–273 | RIF | PowerPoint: "ATLAS Executive Steering Committee: Senior Leadership Interview Key Findings" (07/21) | 2 |
| 4 | 274–284 | RIF | PowerPoint: "ATLAS Executive Steering Committee: Workgroups and Action Planning" (07/21) | 2 |
| 5 | 306 | RIP – (b)(6) | May 12, 2021 email w/attachments (*cf.* Record 4 & 5) | 2 |
| 6 | 307–314 | RIP – (b)(6) | PowerPoint: "CO-ED Sequester Update & Average Wait Time Calculate" (05/21/21) | 2 |
| 7 | 315–316 | RIP – (b)(6) | May 12, 2021 email | 1 |
| 8 | 326–339 | RIF | PowerPoint: "VHA Access Update" (07/22/21) | 4 |

\* The VA misnumbered the October 2022 production. As reckoned from the September 2022 interim production, the October production should have started with Bates Number 199. Additionally, Record 2 was previously produced as part of the September 2022 production.

## November 2022 Interim Production

| Record No. | Bates Nos. | Treatment | Description | Duplicates |
|---|---|---|---|---|
| 1 | 701 | RIP – (b)(6) | May 12, 2021 email w/attachments (*cf.* Records 4 & 5) | n/a |
| 2 | 702–722 | RIF | PowerPoint: "MISSION Act Quality Standards and Related Activities" (09/01/21) | 23 |
| 3 | 828 | RIP – (b)(6) | May 21, 2021 email w/attachments (*cf.* Records 1 & 4) | 2 |
| 4 | 829–836 | RIF | PowerPoint: "CO-ED Sequester Update & Average Wait Time Calculate" (05/21/21) | 2 |
| 5 | 837–838 | RIP – (b)(6) | May 12, 2021 email | 2 |

* Records 1, 2, 4, and 5 were previously produced. Records 1, 4, and 5 were included in the October 2022 production. Record 2 was included in both the September and October 2022 productions.

## December 2022 Interim Production

| Record No. | Bates Nos. | Treatment | Description | Duplicates |
|---|---|---|---|---|
| 1 | 1238–1264 | RIP – (b)(5), (b)(6) | PowerPoint: "Community Care Business Program Management Review (PMR) #1" (07/28/20) | 6 |
| 2 | 1346–1373 | RIP – (b)(5), (b)(6) | PowerPoint: "OCC Bi-Monthly business PMR #1" (09/22/20) | 3 |
| 3 | 1374–1407 | RIP – (b)(5), (b)(6) | PowerPoint: "Community Care Business Program Management Review (PMR) #1" (10/27/20) | 3 |
| 4 | 1497–1524 | RIP – (b)(5), (b)(6) | PowerPoint: "Community Care Business Program Management Review (PMR) #1" (11/24/20) | 1 |
| 5 | 1642–1643 | RIP – (b)(6) | Undated e-mail w/attachment (*cf.* Record 6) | n/a |
| 6 | 1644–1671 | RIP – (b)(5), (b)(6) | PowerPoint: "Community Care Business Program Management Review (PMR) #1" (12/22/20) | n/a |

* The VA misnumbered the December 2022 production. As reckoned from the November 2022 interim production, the December production should have started with Bates Number 1239.

# **<u>Exhibit 2</u>**

**Department of
Veterans Affairs**

# Memorandum

Date:   September 14, 2020

From:   Assistant Secretary for Information and Technology and Chief Information
Officer (005)

Subj:   Update to Freedom of Information Act Substantial Interest Notification Process
(VIEWS 03208266)

To:    Under Secretaries, Assistant Secretaries, and Other Key Officials

1. This is an update to the Release of Freedom of Information Act (FOIA) Information memorandum dated February 11, 2014 (VAIQ# 7441746) regarding release of FOIA information. It is important to review our processes to ensure that we can continue to improve our performance and responsiveness.

2. The FOIA Coordinating Committee met in March 2020 and focused on short and long-term improvements to our FOIA program with a focus on the Substantial Interest (SI) Notification process. Attachment 2 provides the updated guidance to be followed when determining and processing an SI request. The plan will be implemented immediately and will be reflected in the revised guidance to be followed by all Department of Veterans Affairs (VA) FOIA Officers.

3. The SI notification process is consistent with VA FOIA regulations, 38 C.F.R. § 1.555(c), which states that a FOIA Officer determines that the component maintains responsive records that either originated with another component or which contain information provided of substantial interest to another component.

4. The results of the working group will be shared to include an improve process to formally designate and train your FOIA Officers and FOIA Analysts.

5. For additional information or any questions, please contact your Administration's FOIA Officer or VA FOIA Service at (202) 322-3652 or vacofoiaservice@va.gov.

James P. Gfrerer

Attachment:  2
Signed February 11, 2014 Release of FOIA Information Memorandum
Addendum  Substantial Interest Notification Process

Attachment 2:  Update to Freedom of Information Substantial Interest Notification Process

1.  This is an update to the Release of FOIA Information memorandum, dated 2/11/2014, regarding Release of Freedom of Information Act (FOIA) Information.  It is important to occasionally review our processes to ensure that we can continue to improve our performance and responsiveness.

2.  The FOIA Coordinating Committee met during March 2020 and focused on both short- and long-term improvements to our FOIA program. The short-term plan will be implemented immediately while the longer plan will continue to be worked and will be reflected in revised guidance to be followed by all VA FOIA Officers.

3.  The Substantial Interest (SI) notification process is consistent with VA  FOIA regulation 38 C.F.R. § 1.555(c) which provides that when a FOIA Officer determines that the component maintains responsive records that either originated with another component, or which contain information provided by, or of substantial interest to, another component then the FOIA Officer will either:

> (c)(1) Respond to the request, after consulting with the component that originated or has a substantial interest in the records involved; or

> (2) Refer the responsibility for responding to the request or portion of the request to the component best able to determine whether to disclose the relevant records, or to the agency that created or initially acquired the record as long as that agency is subject to the FOIA. Ordinarily, the component or agency that created or initially acquired the record will be presumed to be best able to make the disclosure assessment. The referring component shall document the referral and maintain a copy of the records that it refers.

Further, 38 C.F.R. § 1.555(e) provides:

> (e) Notice of referral. Whenever a FOIA Officer refers all or part of a request and responsibility for processing the request to another component or agency, the FOIA Officer will notify the requester in writing of the referral and provide the requester the name and contact information of the entity to which the request has been referred, after consulting with the entity to which the request is to be referred to ensure that the request is being referred to the correct entity. If only part of the request was referred, the FOIA Officer will inform the requester and identify the referred part at the time of the referral or in the final response.

4.  What constitutes a FOIA request of substantial interest:

> An SI FOIA request is one where, in the component's judgment, the subject matter of the released documents may be of interest or potential

interest to VA senior leadership.  Any requests involving the current administration, previous administrations, Members of Congress (correspondence, calendars, travel, or otherwise), those related to a threat to the public health; requester or requested documents will garner media attention or is receiving media attention; request is for records associated with meetings with prominent elected, business, and/or community leaders; request is for congressional correspondence; request is from a member of the media; request is from a member of an advocacy group, watchdog organization, etc.; request is for records associated with a controversial or sensitive subject; or high profile local or national incidents or situations involving VA beneficiaries, employees or officials; and incidents involving an alleged breach of the public trust (e.g., waste, fraud, or abuse) or current or previous VA leadership would be included .

5.  The VACO FOIA support office will identify incoming FOIA requests of substantial interest to the Office of the Secretary and other Senior Leadership throughout VA.  This initial SI notice will alert leadership to potential follow-up inquiries that may be forthcoming.  Each Administration and VACO Program office will monitor the VACO FOIA Substantial Notification email group.  Each Administration and Program Office is required to keep the VACO FOIA Service informed on personnel changes to allow maintenance of the email list.

6.  When a FOIA request is submitted directly to a FOIA office, other than VACO FOIA Service, the FOIA professional will review the request to determine if the request contains SI equities based on the above criteria.  If the request is determined to be an SI FOIA, the FOIA professional will do the following: upload the request into the FOIAXpress (FX) system; after consultation with responsible FOIA Offices, assign to all FOIA offices that may have responsive records (each referral must have a separate FOIA case number assigned); notify their leadership of the SI request and, provide a copy of the request to the VACO FOIA Service for additional SI notifications.  When providing the copy of the request to the VACO FOIA Service, the FOIA professional will identify all FOIA case numbers assigned to the request and the responsible office to which each case number is associated.

7.  If a FOIA request is received directly by a field or regional FOIA office consult with the Administrations FOIA Officer for guidance.  The Administration FOIA Officer will forward to the VACO FOIA Office for additional VACO FOIA notifications.

8.  If the request is received by the VACO FOIA Support Office, they will acknowledge receipt of the SI FOIA request in an approved summary format and notify the referring component that a SI notification has been sent to VA Leadership.  Additional notifications may be made by Administrations to their respective leadership chains based upon internal notification procedures.  Administrations will be notified if additional documentation describing the request is needed.

9. When uploading SI FOIA requests to FX, you must select the SI option from the drop-down box located in the Requester Category section under "Categories" (multiple categories may be selected). Additionally, you must include an annotation in the comments section of FX, to include; SI notification, office responsible for release, and if additional leadership review is required. The FOIA professional will link all tracking numbers assigned to the request in FX and include in the notes section of FX the responsible office(s) to which each tracking number is associated. The VACO FOIA office will maintain a spreadsheet with all SI notifications made.

10. Initial SI notification will be made via email to the SI group. The FOIA Officers will coordinate with their respective leadership for inclusion and representatives for SI notification. The FOIA Officers will report to their respective leadership chains for additional review.

Weekly SI meetings will be conducted

> **Substantial Interest (SI) <u>Notification</u> Template:**
>
> **To:** VA FOIA SI Review
> **Subject:** SI FOIA <u>Notification</u>, (FX tracking #)
>
> Date received:
> Attached to this email is a FOIA Request The details pertaining to this request are outlined below:
> **Who:** [insert name of FOIA requester]
> **Affiliation:** [insert organization such as ABC News]
> **What:** Requesting the following:
>
> **Assigned/Referred VA FOIA Officer:** [insert your name] (assigned program office)
> **Attachment:** Attach a <u>scanned dated copy</u> of the request
> Due date: 20 working days from date of request is perfected

11. A weekly SI review will be established, meeting with applicable personnel and representatives from component FOIA services. During the weekly meeting stakeholders will identify if they want to review documents prior to final release. Where a pre-release review is requested by leadership, the stakeholder requesting the review will receive a pre-release notification three working days prior to release.

Substantial Interest (SI) Review Template

> To: VA FOIA SI Review
> Subject: SI FOIA Review, [Facility Name, FX Tracking Number]
> Body of the email:
> Attached to this email is a response to a FOIA request received by [VA Program Name] from [Requester name and affiliation] on [date request was received]. The details pertaining to this request are outlined below:

What: Requesting the following:
[Transcribe exactly what the requester is seeking]
Assigned FOIA Officer: [insert your name]
Indicate Number of Processing Days Remaining or Number of Days in Backlog
Status: [example -10 or 10 days remaining]
Attachment:  Attach the following:
a.      A copy of the initial FOIA Request
b.      The proposed Initial Agency Decision Letter
c.      Copies of responsive records as you intend to release them to the requester (with proposed redactions not applied).

12.  In addition to the Office of General Counsel's (OGC) inclusion in the SI process, OGC will confirm with the reporting activity following initial SI notification (paragraph 10) that they need to review records identified as responsive to the request prior to final SI review and release.  Additionally, pursuant to paragraph 13 below, topics that require FOIA/Litigation Coordination will be identified and addressed by OGC prior to final SI review and release.  Final OGC review will take place five business days prior to final notification of SI release.  If OGC review will require more than five days, an estimated time will be provided to the FOIA officer to meet the requirements of 38 C.F.R. 1.556(c) and 1.561(e)(4).  Final release of an SI Request will not occur without OGC clearance.

13.  FOIA/Litigation Coordination (FLC): With respect to matters in litigation, FOIA professionals should coordinate with appropriate OGC personnel in order to ensure consistency within the Department with respect to the disclosure of agency records.

    a. This process is different than the S Notification process, yet has a few similarities.  The FLC is meant to ensure that VA OGC litigators are not caught by surprise if a VA Component releases records, pursuant to a FOIA request, that may impact pending departmental litigation

    b. All FOIA Officers will review the VA Lit site prior to FOIA processing.  The OGC active litigation hold SharePoint site should be consulted to determine if there is an active litigation.  Prior to release the FOIA Officer should consult this website and consult with the attorney identified as the POC for the litigation. https://vaww.ogc.vaco.portal.va.gov/litigation/Lists/active/AllItems.aspx.  All FOIA Officers should maintain contact with District Counsel offices in addition to checking the active litigation hold SharePoint to be cognizant of pending local matters. As all VA litigation is not posted on the litigation hold SharePoint site, FOIA Officers, particularly in VHA, should continue the present practice of reaching out to local leadership to check the list of facility litigation to determine if any FOIA's involve existing litigation.  Those FOIA Officers without an existing practice should check with local leadership for a list of existing litigation.  The FOIA Officer should then reach out to the assigned attorney advising that a FOIA request is the subject of or filed by parties to the litigation.  In addition, if it's determined by OGC that a specific topic should be in the FLC process, they will advise the VACO FOIA support office of the topic and the OGC POC, and

current list of topics will be provided to agency FOIA officers. The OGC will continue work to create a comprehensive list of pending litigation.

14. Once an SI FOIA case has been reviewed for final release, records determined by the processing FOIA office as meeting the definition of "likely to become the subject of subsequent requests due to the nature of the subject matter" shall be provided to the VACO FOIA Office for posting to the VA FOIA Library.

15. The results of the working group will be shared in the coming weeks to include an improved process to formally designate and train your FOIA Officers and FOIA Analysts. Thank you for your support as we continue to improve the FOIA release processes at VA.

16. For additional information or any questions, please contact your Administration's FOIA Officer.